E-FILED
CNMI SUPREME COURT
E-filed: Jun 30 2026 05:29PM
Clerk Review: Jun 30 2026 05:29PM
Filing ID: 79907563
Case No.: 2024-SCC-0023-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**CONRAD M. SABLAN,**
*Plaintiff-Appellant, Cross-Appellee,*

***v.***

**COMMONWEALTH UTILITIES CORPORATION,**
*Defendant-Appellee, Cross-Appellant,*

**AND**

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS,**
*Defendant-Appellee.*

**Supreme Court No. 2024-SCC-0023-CIV**

---

**SLIP OPINION**

**Cite as: 2026 MP 5**

Decided June 30, 2026

————————

CHIEF JUSTICE ALEXANDRO C. CASTRO
ASSOCIATE JUSTICE JOHN A. MANGLOÑA
ASSOCIATE JUSTICE ROBERTO C. NARAJA

————————

Superior Court No. 15-0175-CV
Presiding Judge Joseph N. Camacho, Presiding

————————

CASTRO, C.J.:

¶ 1     Conrad M. Sablan ("Conrad") appeals, and the Commonwealth Utilities Corporation ("CUC") cross-appeals, the Superior Court's decisions in this inverse condemnation case arising from the construction and operation of the Maui IV Water Tank and Pump Station ("Maui IV facility") on the Sablan's family land. The Superior Court found a compensable physical taking and awarded Conrad approximately $2.1 million in compensation and prejudgment interest. We AFFIRM in part, REVERSE in part, and REMAND with specific instructions on valuation methodology.

### I. FACTS AND PROCEDURAL HISTORY

¶ 2     In 1980, the Marianas Public Land Corporation conveyed by quitclaim deed Tract 22654, a 20,672-square-meter parcel in Sadog Tasi, Saipan, to Vicente S. Sablan ("Vicente"). The tract included a reserved right-of-way along its western edge. This right-of-way ran between a small triangular section and the larger remainder of the property.

¶ 3     Vicente died in August 1988, and his estate was promptly administered in probate. In May 1990, the Superior Court issued a decree distributing undivided interests in a portion of Tract 22654 to his widow, Maria Sablan, and their sons, Conrad, Tito Sablan, and Vicente M. Sablan.

¶ 4     In 1991, CUC, in coordination with the Commonwealth government, entered the property and began constructing the Maui IV facility for a public water project. Construction concluded on March 31, 1992. A one-million-gallon concrete tank, pump house, and chain-link fence occupy approximately 1,029 square meters of the western section of the tract. The chain link fence blocked public access through Laguna Drive to the triangular section of the property but the property could still be accessed from the larger section of the property by going around the Maui IV facility.

¶ 5     Conrad visited the completed facility in 1992 and observed the tank and fence. At that time no survey had been conducted to determine whether the structure lay within the boundaries of the 1991 co-owners' land or on an adjacent public right-of-way. No compensation was ever offered or paid.

¶ 6     In 2013, Conrad commissioned Takai & Associates to conduct an as-built survey and subdivide the property to establish separate ownership boundaries among the heirs. The survey established the Maui IV facility occupied a portion of the 1991 co-owners' land. The survey divided Tract 22654 into four parcels:

- Tract 22654-1 (small triangular parcel along the western edge);
- Tract 22654-R1, later subdivided;
- Tract 22654-2; and
- Tract 22654-3.

¶ 7     In November 2013, Maria, Tito, and Vicente M. Sablan executed a Deed of Conveyance and a later Confirmation Deed transferring their interests in Tract 22654-1 and Tract 22654-R1 to Conrad. The deeds conveyed "all rights, title, and

interests" in those parcels. App. at 1337–38. The confirmation deed additionally conveyed all "claims" in the properties as well. *Id.* at 1339–40. In January 2014, Tract 22654-R1 was further divided into Tract 22654-R2, which contained the Maui IV facility, and Tract 22654-4. The two lots at issue in this appeal are Tract 22654-1 and Tract 22654-R2.

¶ 8    In October 2015, Conrad sued CUC and the Commonwealth for inverse condemnation, trespass, and unjust enrichment. He claimed the 1991 construction and continued operation of the Maui IV facility permanently occupied his land without compensation and that the chain-link fence blocked his only access route to Tract 22654-1, rendering it landlocked. Conrad later dismissed his trespass claim.

¶ 9    The defendants denied liability on multiple grounds. CUC argued (1) the claim was time-barred under the statute of limitations, (2) it could not be held liable for inverse condemnation because it lacked statutory eminent domain authority, and (3) any compensation owed belonged to the four co-owners who held the property at the time of the 1991 taking, not to Conrad alone. The Commonwealth joined those positions. As an affirmative defense, CUC also argued it gained title to the land through adverse possession.

¶ 10    The trial court tried the case in two phases. The first phase, addressing whether a taking had occurred, was heard over multiple sessions between August 2019 and June 2020. On June 17, 2020, the court issued its Order After Trial closing the first phase on liability while reserving the issue of prejudgment interest for further proceedings. In September 2022, the court issued its First Order, holding that the government's occupation of Tract 22654 constituted a compensable physical taking under Article XIII, Section 2 of the NMI Constitution. The court further held that the statute of limitations does not bar inverse condemnation actions, that CUC could be held liable despite lacking eminent domain authority, and that the right to compensation vested in the four co-owners at the time of the 1991 taking. The court also found that Tract 22654-1 was not taken, because the parcel only became landlocked due to the 2013 subdivision rather than through any government action. The court rejected CUC's adverse possession defense.

¶ 11    The second phase addressed compensation. Conrad's appraiser, valued the occupied parcel at $367,000 using the sales-comparison method applied to Tract 22654-R2 as if it had existed in 1991 as a standalone parcel. CUC's appraiser testified that the correct approach for a partial taking was the before-and-after method applied to the entire 1991 tract, though he acknowledged the sales-comparison method would be appropriate if the entire parcel had been taken. The court adopted Conrad's appraiser's valuation using the sales-comparison methodology.

¶ 12    Conrad's financial expert proposed a prejudgment interest rate of 8.6674 percent calibrated to Conrad's personal investor profile. The Commonwealth proposed the Moody's Aaa Corporate Bond Index rate of 5.341 percent. The court rejected Campbell's rate as methodologically unreliable because it was

tailored to Conrad's individual circumstances and instead adopted the Moody's Aaa Corporate Bond Index rate. The court entered final judgment awarding Conrad approximately $2,106,366.97 in compensation and prejudgment interest.

¶ 13    Conrad appealed, arguing that the Superior Court erred by: (1) rejecting his expert's higher prejudgment interest rate of 8.6674 percent; (2) holding the 1991 co-owners retained ownership interests in the compensation award despite their 2013 conveyances of all rights, title, interests, and claims to him; and (3) finding no compensable taking of Tract 22654-1 when the government's fence blocked his only access route to that parcel.

¶ 14    CUC cross-appealed, contending the Superior Court erred in: (1) holding: the statute of limitations does not apply to inverse condemnation claims; (2) holding CUC can be liable for inverse condemnation despite lacking statutory eminent domain authority; (3) abusing its discretion by reopening the evidentiary record *sua sponte* after the parties had rested; and (4) adopting Sablan's expert's sales-comparison valuation methodology. The Commonwealth joins CUC's position on the merits but has not filed a separate cross-appeal.

## II. JURISDICTION

¶ 15    The Supreme Court has appellate jurisdiction over final judgments and orders of the Superior Court of the Commonwealth. 1 CMC § 3102(a); NMI CONST. art. IV, § 3.

## III. ISSUES ON APPEAL AND STANDARD OF REVIEW

¶ 16    This appeal presents seven issues, each subject to the following standard of review:

1.   Whether the statute of limitations bars the inverse condemnation claim, which presents a question of statutory and constitutional interpretation reviewed de novo. *In re Estate of Kapileo*, 2026 MP 2 ¶ 12.
2.   Whether CUC is subject to inverse condemnation liability under Article XIII of the NMI Constitution, a question of law reviewed de novo. *Id.*
3.   Whether the trial court abused its discretion in permitting additional proceedings following the liability phase of trial. *See Ito v. Macro Energy, Inc.*, 4 NMI 46, 61 (1993) (holding the trial court's control over timing of trial is reviewed on abuse of discretion); *Olopai v. Fitial*, 3 NMI 101, 108 (1992) (describing reopening a case as within the discretion of the trial court).
4.   Whether a taking occurred as to Tract 22654-1, a mixed question of law and fact. The trial court's factual findings regarding the condition of the property at the time of the taking are reviewed for clear error. *See Santos v. Santos*, 2000 MP 9 ¶ 3 (holding a trial court's findings of fact in a mixed question of law and fact are "still reviewed for clear error"). The legal conclusion that a taking occurred is reviewed de novo. *Castro v. Castro*, 2009 MP 8 ¶ 11.
5.   Whether Conrad was solely entitled to just compensation, a question of law reviewed de novo. *Id.*; *Isla Dev. Prop. v. Jang*, 2017 MP 13 ¶ 6.
6.   Whether the prejudgment interest rate was calculated correctly, a mixed question of fact and law. *Estate of Muna v. Commonwealth*, 2007 MP 16 ¶ 7. The rule of law used to determine the rate is reviewed de novo, and

the determination of a reasonable rate of interest is a factual finding reviewed for clear error. *Id.*

7. Whether the proper valuation methodology was applied to the taking, a question of law reviewed de novo. *See id.*

## IV. DISCUSSION

¶ 17    We affirm the decisions on five of the issues but find reversable error with regards to whether Conrad has the sole right to compensation for the taking and whether the proper valuation methodology was used.

### A. The Inverse Condemnation Claim Was Filed Within the Statute of Limitations

¶ 18    The trial court concluded that statutes of limitation categorically do not apply to inverse condemnation claims because neither the Fifth Amendment nor Article XIII of the NMI Constitution contains express limitations language. We disagree with that reasoning. Constitutional claims are not exempt from ordinary procedural rules. Nevertheless, we affirm the denial of CUC's statute of limitations defense because Conrad's claim was filed within the applicable limitations period.

#### 1. Inverse Condemnation Claims Are Subject to Statute of Limitation

¶ 19    The Takings Clause of the Fifth Amendment and Article XIII, Section 2 of the NMI Constitution guarantee private property may not be taken for public use without just compensation. U.S. CONST. amend. V; NMI CONST. art. XIII, § 2. But a cause of action originating from the Constitution does not eliminate the legislature's authority to place procedural limits on when that right must be asserted.

¶ 20    The Taking Clause of the Fifth Amendment is subject to the statute of limitations. In *John R. Sand & Gravel Co. v. United States*, the United States Supreme Court enforced a six-year statute of limitations applicable to takings claims in the Court of Federal Claims even though the government had effectively waived the defense. 552 U.S. 130, 133–35 (2008). The decision explained some statutes of limitations serve broader systemic purposes beyond protecting defendants from stale claims, including defining the scope of a governmental waiver of sovereign immunity. *Id.* at 133–34.

¶ 21    With regards to the claim under the NMI Constitution, we have previously addressed a similar argument in the due process context. *Estate of Rogolifoi v. Estate of Rogolifoi*, 2024 MP 4 ¶ 41. We found the 7 CMC § 2502(a)(2) statute of limitations to bar a due process challenge to a decades-old Trust Territory title determination, emphasizing that "[t]he statute of limitations provides no exceptions to its enforcement." *Id.*

¶ 22    Persuasive state authority likewise treats inverse condemnation claims as subject to ordinary statutes of limitations. In *DW Aina Le'a Development, LLC v. State*, the Hawaii Supreme Court applied a six-year statute of limitations to a regulatory takings claim brought directly under the Hawaii Constitution. 477 P.3d 836, 847 (Haw. 2020). The Takings Clause created a directly enforceable right

and the claim therefore arose directly from the constitution rather than from statute. *Id.* at 843–45. Even so, the court concluded the constitutional source of the claim did not exempt it from legislatively imposed filing deadlines. *Id.* at 846–47.

¶ 23     We therefore hold inverse condemnation claims in the Commonwealth are subject to the applicable statute of limitations. Neither the constitutional source of the right nor the nature of the remedy creates a categorical exemption from legislatively imposed deadlines. The trial court erred in concluding otherwise.

*2. Conrad's Claim Accrued in 2013 and Was Timely Filed*

¶ 24     The land was taken in 1991 when CUC began building the Maui IV facility. *See Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019) (recognizing claim may be brought immediately upon taking); *Estate of Muna*, 2007 MP 16 ¶ 17 (determining valuation from "actual time of the physical taking as well as the time of payment for the taking"). However, this does not resolve the question of when Conrad's claim accrued. This Court has not previously articulated an accrual standard for inverse condemnation claims.

¶ 25     Federal takings jurisprudence provides a useful framework. A takings claim accrues when "all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). In the specific physical-taking context, accrual requires that two conditions be satisfied: the scope of the occupation must be fixed and ascertainable, and the plaintiff must have known or reasonably should have known that the occupation extended onto his property. *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018). Both conditions serve the same underlying purpose of ensuring that a landowner is not required to file suit before he can reasonably know what has been taken and whether it affects his land. We adopt that standard here.

¶ 26     Whether a landowner knew or reasonably should have known that a government occupation extended onto his property is a factual question that varies with the circumstances of each case. *Boling*, 220 F.3d at 1373. For example, determining whether the government's actions caused erosion to effect a taking requires an inquiry into the physical characteristics of the land, the nature and visibility of the government's occupation, and the information reasonably available to the landowner at the relevant time. *See id.* ("[T]he fact-finder should take into account the uncertainties of the terrain, the difficulty in determining the location of the government's easement, and the irregular progress of erosion").

¶ 27     CUC argues the claim accrued in 1992 because Conrad admittedly knew the Maui IV facility existed when construction concluded. *See Cattellus Dev. Corp v. United States*, 31 Fed. Cl. 399, 406–07 (Fed. Cl. 1994) (discussing how this rule applies when the invasion is obvious, ascertainable, and permanent). But awareness of a nearby public project is not equivalent to knowledge that the project encroaches onto one's own parcel. CUC's argument conflates knowledge

of the government's physical presence in the area with knowledge that the occupation extended onto Conrad's land.

¶ 28    In the Commonwealth, parcel boundaries are often not ascertainable through visual observation alone. Many CNMI parcels received title determinations without actual boundary surveys, leaving precise boundary lines unresolved on the ground.[1] Even where surveys existed, they often described adjacent parcels or right-of-way corridors rather than the landowner's parcel itself, leaving its precise boundaries unresolved until a dedicated survey was commissioned. *See Aguon v. Marianas Pub. Land Corp.*, 2001 MP 4 ¶¶ 7–10 (showing boundary discrepancy in Commonwealth homestead property was only discovered after landowner commissioned a survey decades after receiving title).

¶ 29    No dedicated boundary survey of Tract 22654 existed before 2013. The only pre-2013 survey involving the area surrounding Tract 22654 was a February 1990 Meridian Land Surveying Parceling Plat of adjacent public right-of-way tracts 21709 and 21710, prepared for the Marianas Public Land Corporation, rather than as a boundary survey of Tract 22654 itself. The plat depicted Tract 22654 only as a reference parcel and predated construction of the Maui IV facility entirely. No document showing both the boundaries of Tract 22654 and the tank's footprint in relation to those boundaries existed until the 2013 Takai as-built survey, which marked the first recorded identification of the government's taking.

¶ 30    Further compounding this problem is the Commonwealth's pattern of taking land without notice and refusing to pay landowners. *See, e.g.*, *Commonwealth v. Lot No. 218-5 R/W*, 2016 MP 17 ¶¶ 11–16 (describing failure to appropriate land claims as an "ongoing failure to fulfill a constitutional mandate"). The right to just compensation is based on "a principle of fairness and not a technical rule of procedure." *U.S. v. Dickenson*, 331 U.S. 745, 749 (1947). Under these conditions, imputing notice imposes an additional burden on

---

[1]    The 1979 Determination of Ownership for Tract 22654 was issued based on a 1976 general parcel recording plat rather than a dedicated boundary survey establishing the tract's exact lines on the ground. The boundaries of Tract 22654 and the location of the tank's footprint in relation to those boundaries were not established until the 2013 Takai as-built survey. This reflects a broader feature of Commonwealth land records. The CNMI Division of Land Registration and Survey was created with the mission of surveying "pre-war properties to which the Trust Territory government issued title determination of ownership without actual surveys." *Division of Land Registration and Survey*, DEP'T OF LANDS & NAT. RES., https://dlnr.cnmi.gov/land-registration-and-survey.html. This program reflects the longstanding reality that many Commonwealth parcels received legal title before their exact physical boundaries were ever surveyed on the ground. *See also Estate of Taisacan v. Hattori*, 4 NMI 26, 28 nn.1–2 (1993) (noting that Trust Territory title determinations described land only as "more or less" a certain size and "subject to survey," requiring formal survey methodology to resolve disputed boundary locations).

landowners adjacent to public works for a future benefit that is difficult to quantify financially.

¶ 31     A landowner's awareness of a nearby government structure therefore does not establish knowledge that the structure crosses his property line. In the Commonwealth, that determination often cannot reasonably be made without a formal survey or some other form o actual notice.

¶ 32     The record establishes that both accrual conditions were satisfied no earlier than October 2013. Construction of the Maui IV facility concluded by March 31, 1992, satisfying the first condition by fixing the scope of the occupation. Order I at 4. The second condition was not satisfied until October 2013, when surveyor Jesus D.L.G. Takai completed an as-built survey plat showing the tank and surrounding fence encroached onto Tract 22654. Order I at 6; Order II at 2–3; Supp. App. 1421. Conrad testified to knowing the tank existed in 1992, but not knowing it crossed his property line before the 2013 survey. Tr. 54:11–25. The trial court found Conrad "was aware of the water tank and fences sometime after their construction, but was not aware they were on his land until the October 2013 As-Built survey." Supp. App. 1421.

¶ 33     Because the claim accrued in 2013, Conrad's 2015 complaint was timely under either 7 CMC § 2505 or 7 CMC § 2502(a)(2). We need not decide which limitations period applies. The trial court's categorical conclusion that no statute of limitations applies to inverse condemnation claims was erroneous, but its ultimate determination that Conrad's claim was timely is affirmed under the correct legal standard for accrual.

### B. CUC Is Subject to Inverse Condemnation Liability

¶ 34     Article XIII, Section 1 of the NMI Constitution vests the power of eminent domain in the Commonwealth. Article XIII, Section 2 provides that private property may not be taken without just compensation. CUC argues these provisions must be read together to mean only entities expressly possessing eminent domain authority can be constitutionally required to pay compensation, relying on *In re Estate of Roberto*, 2004 MP 7, and *Castro*, 2009 MP 8. We reject that reading. The constitutional duty to provide just compensation arises from the taking itself, not from the particular allocation of statutory authority.

¶ 35     CUC reads *Roberto* and *Castro* too broadly. In *Roberto*, we held that courts "lack the power of eminent domain" and are "simply incapable of 'taking' property" when reallocating estate assets among private heirs. 2004 MP 7 ¶ 7. In *Castro*, we found that a deprivation caused by a temporary restraining order does not undergo a takings analysis because "the judiciary generally lacks the eminent domain powers reserved for the other branches." 2009 MP 8 ¶ 13.

¶ 36     *Roberto* and *Castro* addressed a narrow institutional question: whether the judiciary, in the exercise of its adjudicative function over private disputes, can effect a compensable taking. Neither case considered the liability of a governmental entity when it affirmatively occupies private property to construct and operate public infrastructure. A court adjudicating competing private claims

does not appropriate property for public use. CUC, by contrast, participated in the planning, construction, and continued operation of a public water facility that physically occupies private land for a public purpose.

¶ 37     The constitutional duty to provide just compensation arises from the act of taking private property for public use, not from the formal possession of eminent domain authority. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314–16 (1987). When the government physically appropriates or occupies private land for a public purpose, the constitutional obligation to compensate attaches to the occupation itself, regardless of whether formal condemnation procedures were invoked. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48 (2021). Were it otherwise, the government could avoid constitutional accountability simply by carrying out public projects through entities to which it has delegated operational authority while withholding formal eminent domain power.

¶ 38     Federal authority confirms this principle. In *Fountain v. Metro. Atlanta Rapid Transit Auth.*, the Eleventh Circuit found unacceptable a theory would permit "the state . . . escap[ing] liability under the just compensation clause by taking property through agencies without statutory powers of eminent domain." 678 F.2d 1038, 1044 (11th Cir. 1982). The Ninth Circuit held in *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency* that governments cannot avoid the strictures of the Constitution "through the expedient of delegating regulatory powers, but not the power of eminent domain, to independent government entities that would then be free to zone away all use of private property without fear of liability." 911 F.2d 1331, 1341–42 (9th Cir. 1990). CUC argues this principle is limited to the regulatory-takings context in which *Tahoe-Sierra* arose. We disagree. This constitutional principle applies with equal force to the entity physically occupying private land rather than merely regulating it. The constitutional obligation to compensate does not turn on which branch of government acts or how statutory authority is distributed.

¶ 39     The Legislature created CUC as a public corporation within the Commonwealth government to develop and operate public utility infrastructure. 4 CMC § 8121(a), 8122. Acting under the CNMI's Capital Improvements Program, CUC selected the site on Tract 22654, broke ground in March or April 1991, and completed the Maui IV facility by mid-1992, funded through federal grants channeled through the CNMI Office of the Governor and Legislature. App. 1425; Tr. 818–19. Where a governmental entity physically occupies private land to carry out such a purpose, inverse condemnation supplies the mechanism through which the constitutional guarantee of just compensation is enforced. The absence of formal eminent domain authority does not alter the constitutional character of the occupation.

¶ 40     The deprivation of use is clear in this case. The absence of formal eminent domain authority does not alter the constitutional character of CUC's occupation. The trial court correctly concluded that CUC is subject to inverse condemnation liability.

*C. Superior Court Did Not Abuse Its Discretion by Bifurcating Trial*

¶ 41     This case proceeded in separate liability and damages phases. By June 15 2020, the first part of the bench trial concluded. In this first section, the parties had completed presentation of evidence on liability and submitted proposed findings and conclusions directed to those issues. A September 23, 2022 order resolved liability and addressed all the affirmative defenses and explicitly reserved issues, relating to valuation, ownership, and just compensation to a separate hearing. The second part of the bench trial held on January 31, 2023 and March 8, 2024 pertained to these remaining issues. An order and judgment issued on November 8, 2024 resolved the issues of how much money was owed and to whom.

¶ 42     The trial court's decision to receive additional evidence more than two years after the parties rested on liability and submitted proposed findings of fact and conclusions of law raises two questions: whether a reopening of the record occurred at all, and if so, whether the court abused its discretion by ordering it. *See Ito.*, 4 NMI at 61 (stating the trial court has "inherent power to police its docket" through the "timing of trials").

¶ 43     The first question resolves the second. A reopening presupposes a closed record, and that is not what occurred here. *See, e.g.*, *Olapai* 3 NMI at 104 (describing a reopening of the case "after the trial concluded"). Because the damages phase had not yet commenced, the evidentiary record on those issues remained open. Submission of proposed findings did not convert an incomplete bifurcated proceeding into a final, closed record. Nor does the fact that the court identified gaps in the damages evidence and directed further proceedings on them establish impropriety. A court that perceives an incomplete record and acts to complete it exercises precisely the kind of inherent authority that permits case management orders of all kinds. *See Ito*, 4 NMI at 61.

¶ 44     Even assuming the September 2022 order functioned as a reopening, the trial court still possessed authority to proceed in that manner. *Olopai*, 3 NMI at 108–09. Rather than imposing categorical procedural requirements, *Olopai* examined the surrounding circumstances, including the scope of the additional evidence, the timing of the request, the length of the supplemental testimony, and the usefulness of the evidence to the court. *Id.* The Court upheld the trial judge's decision because the defendants "were not prejudiced" by the additional proceedings. *Id.* at 109. That reasoning is consistent with Ninth Circuit practice. *See United States v. McQuisten*, 795 F.2d 858, 864 (9th Cir. 1986) (upholding reopening to admit photograph of defendant and truck where defendant failed to request a continuance to recall the witness for cross-examination and therefore demonstrated no concrete prejudice).

¶ 45     As prejudice to the opposing party is the dispositive inquiry under *Olopai*, then the same standard logically applies whether the court acts on a motion or on its own initiative. The Pennsylvania Supreme Court reached the same conclusion, seeing "no meaningful distinction between the oft-cited scenario of reopening a record on a parties' motion and sua sponte, as discussed herein, as long as in both

scenarios there is no prejudice to either party and, accordingly, justice is served." *Commonwealth v. Safka*, 141 A.3d 1239, 1251 (Pa. 2016).

¶ 46    The September 2022 order presents no abuse of discretion. An abuse of discretion requires prejudice to one side through surprise or inadequate opportunity to make their argument. *See Pritchett v. United States*, 351 A. 3d 14, 19 (D.C. 2026) (discussing factors for an abuse of discretion in the criminal context). The order directed further proceedings on unresolved damages issues. Both sides participated fully, cross-examining witnesses, introducing evidence, and submitting additional briefing. That falls well short of establishing prejudice. The record reflects ordinary judicial management of unresolved compensation issues, not advocacy for either party. *Ito*, 4 NMI at 61.

### D. The Trial Court Did Not Err in Finding No Taking of Tract 22654-1

¶ 47    Conrad argues the Maui IV chain-link fence was a taking of Tract 22654-1 because it blocked access from Laguna Drive through Tracts 21710-R/W and 21709-R/W to Parcel W-10, which fronts the triangular lot. According to Conrad, the fence rendered the parcel permanently landlocked and economically unusable. The record does not support that theory.

¶ 48    A compensable taking occurs when the government physically occupies private property or deprives the owner of all economically beneficial use of a defined parcel. *Loretto*, 458 U.S. at 434–35; *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992). The government never physically occupied Tract 22654-1. Conrad's claim instead rests on the contention that the fence eliminated all practical access to the parcel. *See Carillion Realty Corp. v. State*, 158 Misc. 2d 810, 812 (N.Y. Ct. Cl. 1993) (discussing how denying access to remainder can be a taking). But when the fence was constructed, the area that would later become Tract 22654-1 remained part of a single undivided tract co-owned collectively.

¶ 49    The trial court found access to that area remained available at the time of construction by traversing the interior of the larger Tract 22654. Order II at 14, App. 66. This is a factual finding reviewed for clear error. *See Santos*, 2000 MP 9 ¶ 3. The record supports that finding. Conrad himself testified that before the 2013 subdivision, access to the triangular area remained available through what later became Tract 22654-R1. *See* App. 1298–99 (conceding he could access land if he went through easement). A Land Claims Investigator with the Department of Public Lands likewise testified the area could still be reached from Laguna Drive by crossing the unified parent tract. App. 968. The finding of access is not clearly erroneous.

¶ 50    The loss of access occurred years later, when the 1991 co-owners subdivided Tract 22654 into separate parcels and transferred those parcels among themselves without reserving any internal easement connecting the newly created Tract 22654-1 to Laguna Drive. The trial court expressly found that the landlocked condition resulted from the family's own subdivision decisions rather

than from the government's earlier construction of the fence. App. 76. The record supports that conclusion.

¶ 51     Takings claims require a causal connection between the challenged government action and the alleged deprivation of property rights. *Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002); *see also Carillion Realty Corp.*, 158 Misc. 2d at 813 (holding a landowner cannot recover for a parcel becoming landlocked after rejecting the government's offer of an easement). That causal connection is absent here. Access to the area that became Tract 22654-1 remained available through the co-owner's own land for more than two decades after the fence was constructed. Their later decision to subdivide the property without preserving internal access easements created the landlocked condition now challenged. Because the alleged deprivation resulted from private subdivision decisions rather than government action, no compensable taking of Tract 22654-1 occurred.

### E. The Superior Court Erred in Finding That Compensation Is Shared Among the Four 1991 Co-Owners

¶ 52     The next question is whether the compensation must be shared among the four 1991 co-owners. As discussed above, the claim accrued in 2013 when the taking became ascertainable to the landowners. *Katzin*, 908 F.3d at 1358; *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001) (holding an inverse condemnation claim based on a regulatory taking accrues when ripe). Once vested, that right is personal to the owner and does not automatically pass with a later conveyance of the land itself. *See Palazzolo*, 533 U.S. at 628 (stating when "the fact and extent of taking are known . . .. as a general rule" no compensation will be paid to subsequent purchasers); *Danforth v. United States*, 308 U.S. 271, 284 (1939); *Brooks Inv. Co. v. City of Bloomington*, 232 N.W.2d 911, 918 (Minn. 1975) ("This right has the status of property, is personal to the owner, and does not run with the land if he should subsequently transfer it without an assignment of such right.").

¶ 53     An exception exists where the original owner did not consent to the taking and specifically assigns the compensation right to the current property right. *Snow v. Town of Calumet Okla.*, 512 P.3d 369, 372 (Okla. 2022) (citing *Drabek v. City of Norman*, 946 P.2d 658, 662 (Okla. 1996)); *see also Argier v. Nevada Power Co.*, 952 P.2d 1390, 1392 (Nev. 1998) (discussing a contract of sale transferring the right of compensation as an exception to the general rule).

¶ 54     To determine whether the exception is applicable we must look to the 2013 Confirmation Deed. When interpreting a contract such as a deed, the primary concern is to give effect to the intentions of the parties as expressed in the instrument. *Saipan Achugao Resort Members Ass'n v. Wan Jin Yoon*, 2011 MP 12 ¶ 15; *see Benavente v. Marianas Pub. Land Corp.,* 2000 MP 13 ¶ 37 (looking to contract law cases for guidance on interpreting a deed) The language of a deed which is "plain, certain, and unambiguous" should be given its plain construction. *Benavente,* 2000 MP 13 ¶ 37. When ambiguity remains, we may

look outside the four corners of the agreement. *Northern Marianas Hous. Corp. v. BankPacific, Ltd.*, 2021 MP 7 ¶ 14.

¶ 55    The 2013 Deed of Conveyance and the later Confirmation Deed both conveyed to Conrad not only ownership of Tracts 22654-R2 and 22654-1, but also "all rights, title, and interests" in the parcels. App. at 1337–40. The Confirmation Deed indicates it was filed simply to fix a typo in the original deed but includes additional language not present in the original deed. It transfers "claims" in the parcels in one section of the deed along with the original "all rights, title and interests." *Id.* at 1339–40. Claim is a "broad and comprehensive term" including title and ownership. *Sherman v. Sherman*, 122 N.E. 439, 443 (S.D. 1909).

¶ 56    There is an ambiguity from the inclusion of "claim." The Confirmation Deed was filed to fix an error with the lot number of the property but also seems to grant an additional broad interest in the property. The other language in the Confirmation Deed does not resolve this ambiguity. Interest is broad and refers "both generically to include varying aggregates of rights, privilege, powers and immunities and distributively to mean any one of them." Restatement (First) of Property § 5.

¶ 57    A right is "a legally enforceable claim of one person against another, that the other shall do a given act or shall not do a given act." Restatement (First) of Property § 1. As an inverse condemnation claim is a legally enforceable claim against the government to be paid money, it is a right. NMI CONST. art. XIII. To determine exactly what claims, rights, title and interests were conveyed, we will need to look outside the four corners of the document. *Northern Marianas Hous. Corp.*, 2021 MP 7 ¶ 14. While typically the right is personal when it accrues and would not be transferred with the property absent an explicit mention, the surrounding context around the transfer makes clear the parties' intent.

¶ 58    The 1991 co-owners were subdividing the property and the survey was done for this purpose. This survey revealed an interest in the property they were previously unaware of, the inverse condemnation claim. *See Drabek*, 946 P.2d at 662 (holding claim will not accrue to original owner when unaware of use of property). The claim was present in the parcels until 2013 when the subdivision made the co-owners ascertain its existence. Alerted to the unknown taking, the co-owners then subdivided all their interests in the land shortly later in November 2013.

¶ 59    This subdivision is not analogous to where a third-party paid a market price that accounted for the decrease in value. *See Maslonka v. Pub. Util. Dist. No. 1 of Pend Orielle County*, 533 P.3d 400, 406 (Wash. 2023) (stating "no damages should be awarded" to such a purchaser). A closer analogy is when there is a pipe hidden in the property that is unknown to the owner at the time of taking: in such instance, any subsequent purchaser would not receive a reduced price on the property and the takings claim runs with the land until it accrues. *Cox Enters. v. Phillips Petroleum Co.*, 550 P.2d 1324, 1326 (Okla. 1976). Here, the survey

done for the subdivision dug up the hidden taking and gave the subdividers the knowledge. They then proceeded with their original intent to subdivide the property within the same year. They clarified that they intended to convey all the rights, title, interests, and claims that they discovered through the survey.

¶ 60    The instrument indicates the owners' intent to convey to Conrad the inverse condemnation interest related to the taking on his land. We fulfill that intent today. The trial court erred in requiring compensation be paid to the other 1991 co-owners.[2]

### F. The Superior Court Did Not Clearly Err in Adopting the Moody's Aaa Prejudgment Interest Rate

¶ 61    Prejudgment interest in a takings case is a constitutional component of just compensation. *Est. of Muna*, 2007 MP 16 ¶¶ 14–15. Its purpose is to place the owner in as good a pecuniary position as if payment of just compensation had coincided with the taking. *Lot No. 353 New G*, 2015 MP 6 ¶ 15. To achieve that objective, courts apply the prudent investor rule, which asks what rate of return a reasonably prudent investor would have earned by investing the compensation proceeds during the prejudgment period while preserving principal as well as the current value of the property. *Est. of Muna*, 2007 MP 16 ¶ 19. The appropriate rate is a factual determination grounded in the evidentiary record. *Lot No. 353 New G*, 2015 MP 6 ¶ 31.

¶ 62    Conrad argues the trial court was required to accept his financial expert's proposed rate of 8.6674 percent because his expert testimony was unrebutted. That argument misunderstands both the role of the trial court and the nature of the prudent investor standard. Under NMI Rule of Evidence 702, the trial court serves as a gatekeeper with broad discretion to determine whether expert testimony rests on a reliable methodology and will assist the trier of fact, regardless of whether the opposing party presents competing expert evidence. *See Commonwealth v. Lisua*, 2024 MP 11 ¶¶ 17, 19–20 (reviewing criteria for evaluating expert testimony without referencing to evidence of the opposing party). The United States Supreme Court has likewise explained that the gatekeeping obligation exists independently of whether contrary expert testimony is offered. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–97 (1993) (establishing criteria for evaluating expert testimony without reference to evidence presented by the opposing party). The expert testimony was not immune from scrutiny simply because it was unrebutted. The trial court remained obligated to determine whether his methodology satisfied the prudent investor rule.

¶ 63    The prudent investor rule is an objective standard. It asks what a hypothetical reasonable investor would have earned, not what a particular

---

[2]    This analysis does not impact the discussion of the rate to be paid as the 1991 co-owners could not retroactively alter the just compensation owed. *See Est. of Muna v. Commonwealth*, 2007 MP 16 ¶ 17; *Commonwealth v. Lot No. 353 New G*, 2015 MP 6 ¶ 15.

plaintiff's individualized investment strategy might have produced. The trial court identified deficiencies in the expert's analysis supporting its conclusion that his methodology did not reliably measure that objective benchmark. The portfolio was constructed around Conrad's personal characteristics, including his age, risk tolerance, and financial circumstances in 1991, when he was twenty-seven with a long investment horizon. The expert also acknowledged that the portfolio would have differed had the other 1991 co-owners been considered. Because the compensation right vested in multiple owners at the time of the taking, not Conrad alone, a model anchored to his individualized financial profile applied a subjective framework inconsistent with the prudent investor rule. On this record, the trial court did not clearly err in rejecting Conrad's proposed rate.

¶ 64    The trial court adopted the Moody's Aaa Corporate Bond Index, using Conrad's compounding methodology and a prejudgment period extending from April 1991 through October 2024. Applying those rates to the trial court's principal valuation of $367,000 produced a total compensation figure of $2,106,366.97 and a compound annual growth rate of 5.341 percent. *See* Order II at 20, App. 72.

¶ 65    Conrad argues the trial court should have ended the calculation period in January 2023, the endpoint used in his expert's report, rather than October 2024. But prejudgment interest runs from the date of taking through the date of judgment, not merely through the date selected by an expert witness for purposes of calculation. The trial court therefore properly extended the calculation through October 2024 to account for the full period of delay.

¶ 66    Conrad further argues the trial court could not rely on the Moody's Aaa Corporate Bond Index without supporting expert testimony. We disagree. The Moody's index was introduced into evidence in this case, and the trial court relied on the same dataset used by the Commonwealth in calculating its own proposed prejudgment interest rate. This dataset is published by the Federal Reserve as an economic indicator.[3] The trial court therefore did not require expert testimony merely to consider or rely upon the published rates themselves.

---

[3]    The Moody's Aaa Corporate Bond Index was published by the Federal Reserve in its official H.15 Selected Interest Rates release until October 11, 2016 when it was discontinued as they were publicly available through other means. Statistical Release, Fed. Rsrv., Discountuance of Several Rates on October 11, 2016 (Oct. 3, 2016), https://www.federalreserve.gov/releases/h15/current/h15.pdf. The rate continues to be published by the Federal Reserve Bank of St. Louis. *Moody's Seasoned Aaa Corp. Bond Yield*, FED. RSRV. BANK OF ST. LOUIS, https://fred.stlouisfed.org/series/AAA. We take judicial notice of the fact of this publication's public availability as it is not subject to reasonable dispute and can be accurately and readily determined by sources that cannot be reasonably questioned. NMI R. EVID. 201(b); *see In re Est. of Yana*, 2014 MP 1 ¶ 19 (stating it is permissible to take judicial notice to "indicate what was in the public realm at the time").

¶ 67    The trial court selected a conservative market-based benchmark tied to long-term, high-grade corporate bonds after concluding that Conrad's expert's proposed rate rested on speculative assumptions tied to his individualized investment profile. That determination finds substantial support in federal takings jurisprudence, which this Court can look to for guidance in applying the constitutional requirement of just compensation. *See Commonwealth v. Lot No. 353 New G*, 2015 MP 6 ¶ 24 (noting argument on interest rate determination had already been rejected by the United States Court of Federal Claims). The Court of Federal Claims has repeatedly approved use of the Moody's Aaa rate as a reasonable benchmark under the prudent investor rule. *Jackson v. United States*, 155 Fed. Cl. 689, 720 (2021); *Tech. College of the Low Country v. United States*, 147 Fed. Cl. 364, 368–70 (2020); *Sears v. United States*, 132 Fed. Cl. 6, 27 (2017).

¶ 68    The prudent investor rule does not require courts to select the highest return a reasonable investor could have achieved. It requires a rate reasonably reflecting the return of a prudent investor while preserving principal over time. The Moody's Aaa rate satisfies that standard. It is a market-based benchmark supported by both the evidentiary record and persuasive federal authority. The rate selected by the trial court was therefore supportable on the record before it.

### G. Valuation Methodology

¶ 69    We turn finally to CUC's cross-appeal concerning valuation methodology. CUC argues the trial court applied the wrong framework in calculating just compensation for the 1991 taking. Specifically, CUC contends the court improperly valued the taking based on a later-created subdivision parcel rather than the parent tract as it existed at the time of the government's occupation. We agree and remand for recalculation of just compensation under the proper valuation methodology.

#### 1. The Superior Court Erred in Applying the Sales-Comparison Method to a Post-Taking Subdivided Parcel

¶ 70    The constitutional requirement of just compensation is anchored to the date of taking. *Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019). Compensation must therefore be measured by the fair market value of the property at the time the government physically occupied it, not at some earlier or later date. *Danforth v. United States*, 308 U.S. 271, 284 (1939) ("compensation is due at the time of taking"). Once the taking occurs, the boundaries of the affected property are fixed for purposes of valuation. Subsequent subdivisions, conveyances, or physical changes to the land do not alter the legal baseline from which just compensation is calculated. *See Est. of Muna*, 2007 MP 16 ¶¶ 17–19; 2 CMC § 4712.

¶ 71    When CUC entered Tract 22654 in 1991 and constructed the Maui IV facility and surrounding fence, the property consisted of a single undivided tract jointly owned by the four 1991 co-owners. After removing the preexisting rights-of-way, Tract No. 21710 and Parcel W-10, Tract No. 22654 contained approximately 15,441 square meters. *See* App. 1317 (distributing this amount to the heirs in 1990). The parent tract, as it existed in 1991, supplies the proper unit

of analysis. The later subdivisions creating Tracts 22654-1, 22654-R1, 22654-R2, and 22654-4 did not occur until more than twenty years after the taking and do not redefine the property interest affected by the government's occupation.

¶ 72    The evidence further established that the Maui IV facility occupied only a limited portion of the original tract. Survey testimony placed the tank, pump house, and fenced area at approximately 1,029 square meters, the current 22654-R2. Tr. 184:5–10, App. 1245. The remainder of the tract continued to exist outside the physical footprint of the facility. A partial taking of this kind is ordinarily valued using the before-and-after method, which measures the difference between the fair market value of the parent tract immediately before the taking and the fair market value of the remainder immediately afterward. *See Olson v. United States*, 292 U.S. 246, 255 (1934) (holding landowner "entitled to be put in as good a position pecuniarily as if his property had not been taken"). CUC's appraiser testified the before-and-after method was appropriate under the circumstances, and Conrad's appraiser agreed that the method would apply if the taking were partial rather than whole. *See* Order I at 9, App. 24.

¶ 73    The flaw in Conrad's appraisal was the decision to value Tract 22654-R2 as a separate parcel entirely taken by the government. Tract 22654-R2 did not come into existence until 2014, more than two decades after construction of the Maui IV facility. By treating the later-created subdivision parcel as the relevant property interest, the appraisal departed from the date-of-taking rule in two respects. It employed the wrong unit of analysis and valued the taking as though the government had acquired an entire discrete parcel rather than physically occupying only part of a larger tract.

¶ 74    Conrad's appraiser further acknowledged he appraised Tract 22654-R2 under client-imposed assumptions, including the assumption that the entire parcel had been taken and should be valued as vacant land. Tr. 655:2–24, App. 1344. Those assumptions did not correspond to the property interest existing at the time of the taking. The government did not acquire a vacant subdivided parcel in fee simple. It permanently occupied approximately 1,029 square meters of a larger tract. Because the appraisal valued a later-created subdivision parcel rather than the parent tract as it existed in 1991, it did not reliably measure the loss attributable to the government's occupation. *See Dow*, 357 U.S. at 20–22. The trial court therefore erred in adopting Conrad's appraisal as the measure of just compensation.

### 2. Instructions on Remand

¶ 75    We therefore vacate the compensation award and remand for recalculation of just compensation under the proper valuation framework. On remand, the trial court shall make a factual finding of the value of Tract 22654 as it existed at the time of the 1991 taking, after accounting for the preexisting right-of-way deductions reflected in the record. The relevant valuation date remains March 31, 1991.

¶ 76    The trial court shall apply the before-and-after method to determine the difference between the fair market value of the parent tract immediately before the government's occupation and the fair market value of the remainder immediately afterward, taking into account the permanent occupation of approximately 1,029 square meters by the Maui IV facility. The court's prior finding, affirmed in this opinion, that no separate taking of Tract 22654-1 occurred remains undisturbed. The valuation on remand is therefore limited to the partial occupation of the parent tract by the Maui IV facility. The parties may present updated appraisal evidence consistent with the valuation principles set forth in this opinion.

## V. CONCLUSION

¶ 77    We affirm in part, reverse in part, vacate in part, and remand. We AFFIRM the trial court's rulings that:

    a.  CUC is not entitled to dismissal on statute of limitations grounds because Conrad's inverse condemnation claim accrued in 2013;

    b.  CUC may be subject to inverse condemnation liability under Article XIII notwithstanding its lack of independent eminent domain authority;

    c.  Further proceedings following the liability phase of trial were permissible;

    d.  No taking of Tract 22654-1 occurred; and

    e.  Moody's Aaa Corporate Bond Index provided an appropriate prejudgment interest rate.

¶ 78    We REVERSE the trial court's decision distributing the compensation award to the 1991 co-owners and hold that Conrad alone is entitled to the award. We further REVERSE the trial court's application of the sales-comparison valuation methodology and conclude that the before-and-after method must be applied.

¶ 79    We VACATE the compensation award and REMAND for recalculation of just compensation under the before-and-after method, applied to Tract 22654 as it existed at the time of the 1991 taking.


    SO ORDERED this 30th day of June, 2026.


  /s/
ALEXANDRO C. CASTRO
Chief Justice


  /s/
JOHN A. MANGLOÑA
Associate Justice

/s/
ROBERTO C. NARAJA
Associate Justice

COUNSEL

Brien Sers Nicholas, Saipan, MP, attorney for Appellant/Cross-Appellee Conrad M. Sablan

J. Robert Glass Jr., Saipan, MP, attorney for Appellee Commonwealth of the Northern Mariana Islands

Kathryn B. Fuller & Colin M. Thompson, Saipan, MP, attorneys for Appellee/Cross-Appellant Commonwealth Utilities Corporation

NOTICE

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it remains subject to revision or withdrawal. If any discrepancies arise between this slip opinion and the opinion ultimately certified for publication, the certified opinion will control. Readers are requested to bring any errors to the attention of the Clerk of the Supreme Court at P.O. Box 502165 Saipan, MP 96950; telephone (670) 236–9715; or e-mail Supreme.Court@NMIJudiciary.gov.*

E-FILED
CNMI SUPREME COURT
E-filed: Jun 30 2026 05:29PM
Clerk Review: Jun 30 2026 05:29PM
Filing ID: 79907563
Case No.: 2024-SCC-0023-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**CONRAD M. SABLAN,**
*Plaintiff-Appellant, Cross-Appellee,*

**v.**

**COMMONWEALTH UTILITIES CORPORATION,**
*Defendant-Appellee, Cross-Appellant,*

**AND**

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS,**
*Defendant-Appellee.*

---

**Supreme Court No. 2024-SCC-0023-CIV**
Superior Court Civil Action No. 25-0175

### JUDGMENT

Plaintiff-Appellant/Cross-Appellee Conrad M. Sablan appealed the trial court's order and judgment awarding him $2,106,366.97 in compensation and prejudgment interest. Defendant-Appellee, Cross-Appellant Commonwealth Utilities Corporation cross-appealed the order and judgment. For the reasons set forth in the accompanying opinion, the Court AFFIRMS in part, REVERSES in part and REMANDS for further proceedings.

ENTERED this 30th day of June, 2026.


/s/
_____
JUDY ALDAN
Clerk of the Supreme Court